Christine and Edward BOUCHER, husband and wife, individually and as parents and natural guardians of Rosemary Boucher, a minor, Appellants,

v.

**PENNSYLVANIA HOSPITAL,**
**Appellee.**

Superior Court of Pennsylvania.

Argued Sept. 24, 2002.

Filed July 31, 2003.

Reargument Denied Oct. 2, 2003.

Matthew A. Casey and Thomas R. Kline, Philadelphia, for appellant.

James A. Young, Philadelphia, for appellee.

BEFORE: TODD, MONTEMURO,* JJ., and McEWEN, P.J.E.

* Retired Justice assigned to Superior Court.

OPINION BY TODD, J.:

¶ 1 Christine Boucher and her husband Edward Boucher, individually and as parents and natural guardians of their daughter Rosemary Boucher, appeal the judgment entered November 2, 2001 upon the jury verdict in favor of Appellee Pennsylvania Hospital. Upon review, we reverse and remand for a new trial.

¶ 2 The record reveals that Christine Boucher gave birth to Rosemary at term via a vaginal delivery at 2:59 p.m. on April 3, 1996 after a normal pregnancy. At approximately 4:30 p.m. Rosemary was admitted to the well baby nursery where, at approximately 7:50 p.m., her pulse rate was measured at 90, 30 points below the low range of normal. The attending physician on duty was called regarding this drop in Rosemary's pulse rate, but did not personally examine her.

¶ 3 Sometime after 8:45 p.m., one of the nurses transported Rosemary to her mother's room for a feeding. While there, Rosemary appeared cyanotic and limp. She was returned to the nursery, examined by another on-call pediatrician, and underwent a CT scan. The CT scan revealed a subdural hematoma and Rosemary was transferred to Children's Hospital of Philadelphia for treatment. As a result of this hematoma, Rosemary suffers from severe neurological impairment.

¶ 4 The Bouchers brought the present action in 1998, alleging that employees of Pennsylvania Hospital negligently caused or failed to prevent a traumatic injury to Rosemary, and the matter proceeded to trial on a *res ipsa loquitur* theory. The jury returned a verdict for Pennsylvania Hospital, and Appellants timely filed a post-trial motion seeking a new trial. On November 2, 2001, the trial court denied Appellants' post-trial motions and entered

judgment for the hospital. This timely appeal followed.

¶ 5 On appeal, the Bouchers ask this Court to determine the following issues, which we have renumbered:

1. Should a new trial be granted as a result of the trial court's error in disallowing the cross-examination of defendant-appellee expert, Robert Stavis, M.D., regarding his review of defendant-appellee['s] neuroradiology report?

2. Should a new trial be granted because at least two jurors responded falsely to the trial court's inquiry regarding misconduct and their receipt of extraneous information?

3. Should a new trial be granted as a result of the trial court's error in its *res ipsa loquitur* jury charge that prejudiced plaintiff-appellant's claim on the ultimate issue in the case?

(Appellants' Brief at 3.)

■ ¶ 6 In reviewing a trial court's decision to grant or deny a motion for a new trial, "it is well-established law that, absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial." *Harman v. Borah*, 562 Pa. 455, 466, 756 A.2d 1116, 1121–22 (2000). Moreover, "[a] new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Id.* at 467, 756 A.2d at 1122 (citations omitted).

■ ¶ 7 Under *Harman*, we must first determine whether we agree with the trial court that a factual, legal or discretionary mistake was, or was not, made. *Id.* If we agree with the trial court's determination that there were no prejudi-

cial mistakes at trial, then the decision to deny a new trial must stand. If we discern that a mistake was made at trial, however, we must then determine whether the trial court abused its discretion in ruling on the motion for a new trial. *Id.* at 468, 756 A.2d at 1123. A trial court abuses its discretion by rendering a judgment that is manifestly unreasonable, arbitrary or capricious, or has failed to apply the law, or was motivated by partiality, prejudice, bias or ill will. *Id.* at 469, 756 A.2d at 1123 (citations omitted).

■ ¶ 8 We first address Appellants' argument that the trial court erred in disallowing the cross-examination of Pennsylvania Hospital's expert, Robert Stavis, M.D., regarding an expert report prepared on Pennsylvania Hospital's behalf by Orest Boyko, M.D., who was not called to testify at trial. We are thus asked to address the permissible scope of cross-examination of a party's expert with a report produced by a party and authored by a nontestifying expert.

¶ 9 Appellants set forth their argument as follows:

During his direct examination of Dr. Robert Stavis, a board certified neurologist, counsel for [Pennsylvania Hospital] went to great lengths to establish Dr. Stavis' opinion that trauma could be ruled out as a causative factor in this case. The entire case at trial turned on this issue. Toward this end, on direct examination, [Dr.] Stavis testified that the absence of bleeding between Rosemary Boucher's periosteum and her bone tissue, a condition called cephalohematoma, was a key indicator that no trauma occurred to Rosemary Boucher's skull.

* * *

On cross examination, however, Dr. Stavis admitted having reviewed the ex-

pert report of [Pennsylvania Hospital's] neuroradiologist Dr. Orest Boyko. Furthermore, [Dr.] Stavis testified that a neuroradiologist's opinion as to what the CT film shows would be important in discerning the film correctly. [Dr.] Stavis also admitted that he considered Dr. Boyko's opinion in formulating his own opinion in the Boucher case. . . .

Counsel for [the Bouchers] repeatedly attempted to cross-examine Dr. Stavis on the Boyko report. On two occasions, [the Bouchers'] counsel established with the court the need to examine Dr. Stavis' credibility considering that he testified on direct examination, at length, that a cephalohematoma was not present and, to the contrary, that a neuroradiologist, the true expert according to [Dr.] Stavis, found evidence of "resolving cephalohematoma". Counsel for [the Bouchers] informed the court that his attempted cross-examination was not pursuant to bringing [Dr.] Boyko's report into evidence, but rather to go to [Dr.] Stavis' credibility.

(Appellants' Brief at 16–17, 20–21 (record citations omitted).)

¶ 10 The trial court prohibited cross-examination based on the Boyko report, concluding that the report was hearsay:

> Dr. Stavis testified that he did not rely on the other experts' opinions in forming his own medical opinion. Therefore, the non-testifying experts' opinions could not be used to impeach Dr. Stavis['] testimony. The sole purpose to cross[-]examine Dr. Stavis on the non-testifying experts' opinions was to introduce the non-testifying experts' opinions for its truth asserted therein and there-

fore the non-testifying experts' opinions were inadmissible hearsay.

(Trial Court Opinion, 3/20/02, at 4 (record citations omitted).) While we agree that the report was hearsay, for the reasons that follow, we agree with Appellants that they nonetheless should have been allowed to refer to the report to the degree required to question Dr. Stavis' credibility in relation to his testimony encompassing the report.

■ ¶ 11 It is well-established that an expert may express an opinion which is based on material not in evidence, including other expert opinion, where such material is of a type customarily relied on by experts in his or her profession. *Collins v. Cooper,* 746 A.2d 615, 618 (Pa.Super.2000); *Primavera v. Celotex Corp.,* 415 Pa.Super. 41, 608 A.2d 515 (1992). Such material may be disclosed at trial even though it might otherwise be hearsay (e.g., where the material is the opinion of a treating physician or other expert and that expert does not testify). Such hearsay is admissible because the expert's reliance on the material provides its own indication of the material's trustworthiness: "The fact that experts reasonably and regularly rely on this type of information merely to practice their profession lends strong indicia of reliability to source material, when it is presented through a qualified expert's eyes." *Primavera,* 608 A.2d at 520.

¶ 12 On cross-examination, Dr. Stavis was repeatedly asked about the Boyko report, and while he said he "considered" the report, he would not concede that he relied on it, and ultimately stated emphatically that he did not rely on it. (N.T. Trial, 6/6/01, at 53–54.) Therefore, while there may have been some word games regarding his use of "consider" versus "rely",[1]

---

1. Dr. Stavis, on at least one other occasion, had difficulty using the word "rely" in referring to the opinion of another doctor. Al-

though he conceded that the opinion of a neuroradiologist was "important" and "critical" in reviewing x-rays on which his opinion

and while we do not suggest that "rely" is a "magic word" or its use is obligatory, under these circumstances, we cannot conclude that the trial court erred in rejecting Appellant's attempts to cross-examine Dr. Stavis under the expert reliance exception to the hearsay rule.[2]

■ ¶ 13 Here, however, Appellants frame their issue in terms of credibility and argue that they should have been permitted to cross-examine Dr. Stavis with Dr. Boyko's report because Dr. Stavis "flatly denied that any evidence of cephalohematoma exists in any of the materials he reviewed for trial" (Appellants' Brief at 22), while Dr. Boyko's report "stated that there was evidence of 'resolving cephalohematoma'." (*Id.* at 21–22.) This assertion implicates a consideration different from that underlying the hearsay exception, and, rather, goes to the proper scope of cross-examination.

■ ¶ 14 The scope of cross-examination is within the sound discretion of the trial court, and we will not reverse the trial court's exercise of discretion in absence of an abuse of that discretion. *Yacoub v. Lehigh Valley Med. Assocs.*, 805 A.2d 579, 592 (Pa.Super.2002) (en banc). Generally, "[e]very circumstance relating to the direct testimony of an adverse witness or relating to anything within his or her knowledge is a proper subject for cross-examination, including any matter which might qualify or diminish the impact of direct examination."

*Kemp v. Qualls*, 326 Pa.Super. 319, 324, 473 A.2d 1369, 1371 (1984). Specifically regarding medical experts, the "scope of cross-examination involving a medical expert includes reports or records which have not been admitted into evidence but which tend to refute that expert's assertion." *Collins*, 746 A.2d at 618.

¶ 15 On direct examination, Dr. Stavis was asked repeatedly, at various levels of detail, whether there was any evidence of traumatic injury to Rosemary in the "medical records, including the CAT scan films, the MRIs and the reports concerning those", in "any of the records", or in "any of the records, films or reports" that he reviewed. (N.T. Trial, 6/1/01, at 167–73.) He responded that there was no such evidence. (*Id.*) Specifically, he denied that there was any evidence of a cephalohematoma which results from injury to the cranial bone:

Counsel: What about bleeding in the bone? Apart from being broken, does bone bleed?

Dr. Stavis: Well, the bone bleeds, but it bleeds then into the space either above it, the—and then creates a sub—a cephalohematoma if the bleeding is above the brain—above the skull, that's where we showed the—that's where I wrote the periosteum, so if there's bleeding there, it's going to bleed into that space around it, that will be cephalohematoma. If it bleeds

---

was based, he would not concede that he relied on the opinion of Dr. Noble Thompson, the neuroradiologist at Pennsylvania Hospital with whom he discussed Boucher's films. (N.T. Trial, 6/6/01, at 47–50.)

2. Indeed, our research has disclosed no caselaw suggesting that "consider" and "rely" are interchangeable in this context. Moreover, "consider," which is variously defined as "to think carefully about," "to regard," "to think, believe, or suppose," "to bear in mind," and "to regard with respect," Random House

Webster's Unabridged Dictionary 434 (2nd Edition 1998), has a decidedly different sense than "rely," which is defined as "to depend confidently" or "put trust in," *id.* at 1629. Thus, in the context of the hearsay exception at issue, material which an expert "considers," but on which he does not "rely", could, depending on the context of the expert's testimony as a whole, justifiably be viewed as conferring an insufficient indicia of reliability for admission.

on the inside, you get a type of bleeding called epidural hemorrhage, epi meaning above the dura, and in this case it occurs because there's bleeding between the bone and the membrane on the inside of the skull.

\* \* \*

Counsel: With regard to each of the layers we've reviewed so far in the absence of bleeding or other indication, on what you considered to be trauma, sir, if there were sufficient trauma to cause this particular intracranial bleed, do you have an opinion on whether those kinds of bleeds and that kind of injury should be apparent?

Dr. Stavis: I think you've got to have some evidence the trauma occurred from the physical things that are present. Certainly they—the history, but the physical signs that are present should be consistent with a traumatic injury, and that's not the case here.

(N.T. Trial, 6/1/01, at 172–74.)

¶ 16 In the face of Dr. Stavis' denial that there was any evidence in the "reports" or "records" of a cephalohematoma, counsel for Appellants attempted to cross-examine him with the report of Dr. Boyko. That report was disclosed to Appellants by Pennsylvania Hospital, apparently in anticipation of Dr. Boyko's testimony at trial. It was, at some point, given to Dr. Stavis, who testified he had seen and considered it. Although in the report, Dr. Boyko's ultimate conclusion that there are "no associated findings to suggest a traumatic etiology" agrees with Dr. Stavis, he nevertheless states that "[t]he subcutaneous tissue overlying the right parietal bone demonstrates swelling *consistent with resolving cephalohematoma* that often times is seen associated with normal obstetrical delivery." (Report of Orest B.

Boyko, M.D., 9/1/00 (R. 438–39) (emphasis added).) The report thus belies Dr. Stavis' testimony that there were no indications of cephalohematoma in the reports and records he reviewed. In their cross-examination of Dr. Stavis, we conclude that Appellants were entitled to confront Dr. Stavis with this discrepancy as it tends to refute the assertions he made on direct. *See Collins,* 746 A.2d at 617–18.

¶ 17 While we are unpersuaded by Appellants' reference to *Fisher v. North Hills Passavant Hosp.,* 781 A.2d 1232 (Pa.Super.2001), in this regard, other cases support our conclusion that this cross-examination should have been permitted. For example, in *Rafter v. Raymark Indus., Inc.,* 429 Pa.Super. 360, 632 A.2d 897 (1993), the plaintiff sued over injury allegedly resulting from asbestos exposure. The defendant's expert testified on direct examination that "he had reviewed 'all of [the plaintiff's] x-rays dating back almost 20 years and [he] saw no evidence of an asbestos-related change in his chest'." *Id.* at 367, 632 A.2d at 900 (quoting deposition testimony). On cross-examination, counsel for the plaintiff then questioned the expert regarding a medical report, which had not been admitted into evidence, prepared by the radiologist who took one of the plaintiff's x-rays and which stated that the x-ray showed bilateral pleural thickening in the plaintiff's lungs, a condition consistent with asbestos exposure. *Id.* The trial court admitted this cross-examination over defense counsel's objection, and on appeal we affirmed this decision:

Clearly, when a medical expert reviews an x-ray in preparation for his testimony at trial, any reports prepared by the radiologist who took the x-ray could be expected to have some bearing or impact on that expert's findings. Here, however, Dr. Epstein failed to review Dr. Chon's report which stated that at least

one of [the plaintiff's] x-rays did show an asbestos-related change. Thus, Counsel's cross-examination of Dr. Epstein regarding the x-ray and report of Dr. Chon was a legitimate attempt at diminishing the impact and reliability of Dr. Epstein's opinion. Accordingly, we find that the trial court did not abuse its discretion in allowing Counsel's questioning regarding Dr. Epstein's report.

*Id.* (footnote omitted).

¶ 18 Likewise, in the present case, counsel sought to introduce portions of Dr. Boyko's report to undercut Dr. Stavis' testimony that none of the records or reports he reviewed supported the presence of a cephalohematoma. Indeed, the justification for allowing this cross-examination was arguably stronger than in *Rafter*, as here Dr. Stavis stated that he *had* reviewed Dr. Boyko's report, but nonetheless made misleading statements in regard to it. We recognize that in *Rafter*, the court based its decision in part on its conclusion that a treating radiologist's report could be assumed to have some bearing on a medical expert's opinion, *id.*, whereas Dr. Stavis testified that he *did not rely on the* report of Dr. Boyko, a neuroradiologist, in rendering his opinion. Dr. Stavis did concede, however, that the opinion of a neuroradiologist's reading of the films at issue was important and, indeed, "critical". (N.T. Trial, 6/6/01, at 47, 50.)

¶ 19 Similarly permissive cross-examination was allowed in *Sheetz v. Harrer*, 28 Pa. D. & C.4th 313 (C.P. Montgomery County 1995), *aff'd*, 454 Pa.Super. 695, 685 A.2d 222 (1996). There, the plaintiff sued her doctor and hospital regarding delays in performing a caesarian section to deliver her premature infant, who then developed cerebral palsy. Plaintiff's expert denied on direct examination that prematurity alone may have caused the infant's cerebral palsy. *Id.* at 323. On cross-examination, the trial court allowed, over plaintiff's objection, the expert to be challenged regarding the conflicting comment from a report, not admitted into evidence, of a subsequent treating physician of plaintiff wherein the physician stated that he was aware of nothing other than prematurity that could have led to the infant's condition. *Id.* at 322, 324. The trial court allowed the cross-examination, stating: "[s]uch cross-examination is permissible under *Rafter[, supra,]* and constituted a proper attempt to refute and discredit the testimony of [the plaintiff's expert]." *Id.* at 324. *See also Kemp*, 326 Pa.Super. at 324, 473 A.2d at 1371 (trial court did not err in allowing a defense expert to be cross-examined regarding diagnoses by plaintiff's treating physicians in hospital medical records, which the expert reviewed prior to trial, where the records tended to refute the expert's opinion that plaintiff's illness was easy to diagnose); *Robinson v. Jackson*, 145 Pa.Cmwlth. 211, 218–19, 602 A.2d 917, 920–21 (1992) (on cross-examination of defense expert who examined plaintiff, permitting reference to report of another defense expert who also examined plaintiff and which contradicted the first expert where the first expert explicitly denied the existence of the report, but it was clear from his notes that he had reviewed it).[3]

---

**3.** Pennsylvania Hospital attempts to distinguish some of these cases by noting that they concern reports or records directly involved in medical treatment and not the reports of nontestifying, retained experts. While that distinction may be relevant in the context of the expert reliance hearsay exception—where the issue of what an expert might or might not commonly rely on is germane—we fail to see the relevance of the distinction in the context of cross-examination focused on the misleading statements of an expert on direct examination.

¶ 20 We are mindful of the rule expressed and applied by the courts of this Commonwealth that one party may not compel an expert for the opposing party to divulge his expert opinion. Thus, one party may not subpoena the testimony of an expert for another party. *See Spino v. John S. Tilley Ladder Co.,* 448 Pa.Super. 327, 353–54, 671 A.2d 726, 739 (1996), *aff'd,* 548 Pa. 286, 696 A.2d 1169 (1997). Nor may one party utilize the expert report of another party. *See Columbia Gas Transmission Corp. v. Piper,* 150 Pa.Cmwlth. 404, 408–11, 615 A.2d 979, 982–83 (1992). The basis for this rule is an acknowledgment of an expert's proprietary interest in his own opinion, and the recognition that he should not be required to relinquish it without his consent:

> [T]he private litigant has no more right to compel a citizen to give up the product of his brain, than he has to compel the giving up of material things. In each case, it is a matter of bargain, which, as ever, it takes two to make, and to make unconstrained.

*Id.* at 409, 615 A.2d at 982 (quoting *Pennsylvania Co. for Insurances on Lives and Granting Annuities v. Philadelphia,* 262 Pa. 439, 442, 105 A. 630, 630 (1918)); *accord Spino, supra.*

¶ 21 Under circumstances such as those presented in this case, however, we conclude that this rule does not preclude the use of an expert report for the following limited purpose. Where an expert report is disclosed to another expert and reviewed by that expert, and then by his testimony the expert mischaracterizes that report, either explicitly or by implication, we conclude that basic fairness and the entitlements of cross-examination permit the disclosure of that report to the degree necessary to expose the mischaracterization by the testifying expert. In such circumstances, the report, or portion thereof, is not admitted as substantive evidence, as we note below, and thus its use, we find, is not barred by the rule expressed above in *Spino* and *Columbia Gas, supra.* Moreover, it often will be within the control of the party who retained the expert—to whom the expert provided his report and from whom the expert presumably received compensation—to avoid the issue entirely through judicious disclosure of any expert reports to experts who may be called to testify, and through precise questioning in direct examination.

¶ 22 For these reasons, we conclude that the trial court abused its discretion in not allowing Appellants to cross-examine Dr. Stavis regarding the report of Dr. Boyko and to introduce only as much of the report as was necessary to confront Dr. Stavis with his misleading testimony. We emphasize that this report would not be admitted as substantive evidence: clearly, the report is hearsay, as Dr. Boyko did not testify. Accordingly, Pennsylvania Hospital would be entitled to a jury instruction limiting the evidentiary value of the report to issues of credibility.

¶ 23 Having concluded that the trial court in the instant case erred in denying Appellants the opportunity to confront Dr. Stavis with his misleading testimony in relation to the Boyko report, we must address whether such error was harmless. *See Semieraro v. Commonwealth Utility Equip. Corp.,* 518 Pa. 454, 458, 544 A.2d 46, 47 (1988) ("Not all trial errors, of course, constitute reversible error, thus we must also determine whether the [error] was harmful to appellants."). We conclude it was not harmless.

¶ 24 Dr. Stavis was the sole expert testifying on behalf of Appellee. His testimony went to the central issue in this case: whether trauma could be ruled out as the cause of Rosemary's condition. He testi-

fied that he saw no evidence of trauma, and one aspect of his opinion was his conclusion that there was no suggestion of a cephalohematoma in the records or reports that he reviewed. His credibility generally, and on this point in particular, was critical in undermining the case presented by Appellants, one based on circumstantial evidence and the doctrine of *res ipsa loquitur*. Dr. Stavis' categorical assertion that there was no suggestion of cephalohematoma in the documents under his review could have been cast into doubt by effective cross-examination using portions of the Boyko report, had such examination been allowed. Thus, Dr. Stavis' credibility generally could have been undermined by this examination. As a result, we cannot conclude that such cross-examination, had it been permitted, *might not have* affected the verdict. *See In re M.T.*, 414 Pa.Super. 372, 392–93, 607 A.2d 271, 281 (1992) (an error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict) (citing *Commonwealth v. Bricker*, 525 Pa. 362, 375, 581 A.2d 147, 153 (1990)).

¶ 25 Accordingly, we conclude Appellants are entitled to a new trial. We thus reverse the judgment in favor of Appellees and remand this matter.

¶ 26 Because we have determined that Appellants' remaining arguments concern issues which either may recur on remand or the resolution of which may be instructive to the trial bench and bar, we now address those issues.

¶ 27 The first such issue arises out of events that unfolded while the jury was deliberating. On Monday, June 11, 2001, someone placed an anonymous note into the mailbox of the trial court's chambers. The note stated that it had been revealed to the jury the previous Friday, June 8, 2001, that the daughter of one of the jurors was employed at Pennsylvania Hospital and had "some knowledge of pertinent information concerning events" underlying the present action. The trial court properly reviewed the note with counsel for both parties in chambers, whereupon counsel for Pennsylvania Hospital moved for a mistrial. Appellants' counsel, however, opposed the motion for a mistrial and suggested that the trial court "needs merely to make sure that they are not going to follow anything that's outside of the evidence that they heard in the courtroom. We can certainly get that reassurance from them." (N.T. Trial, 6/11/01, at 9, 14.)

¶ 28 The trial court elected to instruct the jury again that the only information that they were to consider in reaching a verdict was that presented at trial. The trial court further questioned the jury, as a group in open court, as to whether any of them had received any external information. None of the jurors responded that they had any such information and the trial court permitted the jury to continue its deliberations.

¶ 29 After the jury returned its verdict, but before Appellants filed their post-trial motions, Appellants submitted the anonymous note for handwriting analysis using the juror information questionnaires as a basis for comparison. This analysis concluded that the anonymous note most likely was written by Juror # 8. On this basis, Appellants sought a new trial on the basis of jury misconduct, arguing that the information provided by the handwriting analysis was not available to them prior to the jury's verdict.

¶ 30 The trial court, however, concluded that Appellants had waived this issue by failing to preserve it properly at trial, stating:

> Plaintiffs' counsel had the opportunity to object in a timely fashion and instead [chose] strategically to take his chances

with the jury. When the court informed both counsel that it had received an anonymous note alleging one of the jurors had outside information regarding the case, defense counsel moved for a mistrial. Plaintiffs' counsel disagreed with defense counsel and argued to the court, "I strongly urge the Court, we have so much time, so much effort, so much money invested in this trial that it's only right to see it to the end." Plaintiff's counsel strategically argued against the mistrial and [chose] to take his chances with the jury thereby waiving his right to the issue of jury misconduct on appeal.

(Trial Court Opinion, 3/20/02, at 9 (record citations omitted).) We agree, and are not persuaded by Appellants' arguments to the contrary.

¶ 31 We acknowledge that Appellants' counsel did object to the verdict after it had been rendered, but before it was recorded, and that the handwriting analysis was not available until after the verdict had been recorded. These facts, however, do not· change our conclusion, given that the suggestion that the jury likely had received extraneous information from one of their number clearly was presented to Appellants' counsel, who made the strategic decision to proceed before the jury rendered its verdict. Indeed, Appellants' counsel did not seek to have the jury questioned individually, a strategy arguably more likely to reveal any misconduct, until after the jury had returned a verdict unfavorable to his clients.

■■■ ¶ 32 It is clear that allegations of jury misconduct[4] may be waived. *See Commonwealth v. Griffin,* 453 Pa.Super.

657, 670, 684 A.2d 589, 595 (1996) (finding waiver when appellant waited until verdict had been rendered to allege that he recognized one of the jurors as a former counselor in a juvenile program who thus was aware of his prior criminal record); *Commonwealth v. English,* 446 Pa.Super. 569, 576, 667 A.2d 1123, 1127 (1995), *aff'd,* 548 Pa. 528, 699 A.2d 710 (1997). This is especially true when the complaining party foregoes for tactical reasons the opportunity to explore whether the jury indeed has been tainted.

¶ 33 In *English,* we held that the appellant had waived an issue of potential jury misconduct arising out of an allegation that two women who may have been jurors had communicated extraneous information regarding the appellant's prior criminal record because the appellant had declined further inquiry into the subject during the trial. In reaching this conclusion, we stated:

> Here, the defendant was given every opportunity to inquire into the sum and substance of the alleged out-of-court communication as either real or fanciful, substantive or baseless, but he elected to give up the occasion to delve into the subject in favor of proceeding to verdict. His choice having been made to forego inquiry of any possible jury taint cannot be resurrected in either the post verdict or appellate format.

*English,* 446 Pa.Super. at 575–76, 667 A.2d at 1126–27.

¶ 34 In the present case, therefore, we agree with the trial court that Appellants waived any arguments regarding potential jury misconduct. Accordingly, we discern

---

**4.** The exception to the waiver doctrine pertaining to allegations of judicial misconduct, *see Commonwealth v. Hammer,* 508 Pa. 88, 90, 494 A.2d 1054, 1060 (1985), *overruled on other grounds by Commonwealth v. Grant,* 572

Pa. 48, 813 A.2d 726 (2002), is not applicable in the present action as the allegation herein regards jury misconduct rather than judicial misconduct.

no error on the part of the trial court with respect to this issue.

¶ 35 We next address Appellants' argument that the trial court erred in its instructions to the jury regarding the doctrine of *res ipsa loquitur.* As with Appellants' first issue, however, the trial court found that Appellants had waived this issue "by failing to object or to take special exception to the jury charge regarding *res ipsa loquitur.*" (Trial Court Opinion, 3/20/02, at 5.) Specifically, the trial court noted:

> During the charging conference Plaintiffs' counsel requested the court read the standard charge on *res ipsa loquitur.* The court agreed to read the standard *res ipsa loquitur* charge 5.08. After the court read the entire charge to the jury the court asked both counsel if they wished to see him. Plaintiffs' counsel did not need to meet with the court but defense counsel requested to see the court at sidebar. At the sidebar, plaintiff[s'] counsel did not make any objections to the *res ipsa loquitur* charge or give the court any indication that there was a problem with the charge. Plaintiffs' counsel has therefore waived his right to a new trial based on the *res ipsa loquitur* charge due to his failure to properly object to the charge.

(*Id.* at 7 (record citations omitted).) Appellants argue to the contrary that pursuant to Rule 227.1 of the Pennsylvania Rules of Civil Procedure, they adequately preserved this issue for appellate review by submitting a proposed point for charge.

¶ 36 After a thorough review of the record, we hold that Appellants have waived this issue, albeit for a different reason than that relied upon by the trial court. The basis for Appellants' argument that they adequately preserved this issue is their submission of a proposed point for charge. Appellants' proposed points for charge, however, are not part of the certified record before this Court. It is axiomatic that "an appellate court cannot consider anything which is not part of the record in this case." *Bennyhoff v. Pappert,* 790 A.2d 313, 318 (Pa.Super.2001) (citations omitted) (holding that appellants had waived assertion of error in trial court's refusal of proposed jury instruction because proposed instructions were not part of the certified record).

¶ 37 In the present case, the proposed instructions were not included within the certified record or the reproduced record and, indeed, the docket sheet indicates that they were not filed in the trial court. Accordingly, we hold that our effective appellate review has been precluded and, therefore, that Appellants have waived this issue.[5]

¶ 38 Judgment **REVERSED.** Case **REMANDED** for a new trial. Jurisdiction **RELINQUISHED.**

---

5. This Court has, under certain circumstances, overlooked an omission of material from the certified record when it could be found in the reproduced record. *See Stewart v. Owens–Corning Fiberglas,* 806 A.2d 34, 37 n. 3 (Pa.Super.2002). As we noted, however, Appellants did not include the proposed points for charge in the reproduced record. Moreover, this Court in *Bennyhoff, supra,* found that the appellants had waived such an issue even though the disputed instruction was included in the reproduced record, when it was not also in the certified record. *Bennyhoff,* 790 A.2d at 318.