**Stang v. Smith**

C.P. of Carbon County, No. 09-3311

*Gary Solomon*, for plaintiff.
*John R. Hill*, for defendant Neil Lesitsky, M.D.

*Candy Barr Heimbach*, for defendant Rajinish Chaudhry, M.D.

NANOVIC, *P.J.*, July 28, 2014—The basic facts at issue in these proceedings are not uncommon. The negligence of multiple persons is alleged to have combined and caused injury to another — here death. Decedent's estate files suit against all defendants. None of the defendants files a cross-claim against any other defendant. Prior to trial plaintiff settles with some, but not all of the defendants.

Under these circumstances, whether the names of the settling defendants should be included on the jury verdict slip in order that the liability of each defendant and the degree of their comparative fault can be assessed and determined by the jury, and whether an expert witness called by plaintiff to testify as to the causal negligence of a non-settling defendant, but who opined in response to pre-trial discovery that the causal negligence of both settling and non-settling defendants was responsible for plaintiff's injuries, can be cross-examined at trial on the witness's earlier opinions critical of the settling defendants, are issues requiring the court's attention. We address these issues below.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 21, 2007, John Stang ("decedent") was found dead lying on the floor of the Intensive Care Unit ("ICU") of the Gnaden Huetten Memorial Hospital ("hospital"). The cause of death was DVT/PE, pulmonary embolism caused by deep vein thrombosis from the lower extremities. In layman's terms, he died of suffocation from clots in his pulmonary arteries which prevented the exchange of oxygen between his blood and lungs.

What caused decedent's death is not in dispute; why, is.

This dispute begins with the events of November 15, 2007. On that date, during the early morning hours, decedent awoke, dizzy and disoriented, and began to vomit. His wife, Lorrie Stang, contacted Dr. Neil Lesitsky, a primary care physician, who saw decedent for the first time on November 2, 2007, for a physical examination. The results of this examination were characteristic of those expected for a fifty-six-year-old white male who was overweight and out of shape: hypertension, hyperlipidemia (high blood fats), hyperglycemia (high blood sugar) and diabetes. All are risk factors for stroke. Medication was prescribed.

When Mrs. Stang spoke with Dr. Lesitsky on November 15, 2007, she described decedent's symptoms. Dr. Lesitsky made a preliminary diagnosis of benign positional vertigo and recommended that decedent lie down and get rest. Dr. Lesitsky also advised that if decedent's condition continued or worsened he should be taken to the Hospital for further evaluation. This conversation occurred at approximately 2:00 A.M.

Later that morning, between 6:00 and 6:30 A.M., Mrs. Stang left for work. She was employed as a pilot driver — an escort for oversized over-the-road motor vehicles — and was scheduled to be out of state. Expecting to be away most of the day, Mrs. Stang arranged for her sixteen-year-old son, Edward Curtis,[1] a sophomore in high school, to stay at home and watch decedent. Edward was instructed that if decedent's condition worsened to immediately call 911.

While she was away Mrs. Stang periodically checked with her son as to decedent's condition. No change was noted. When Mrs. Stang returned home at 5:30 P.M.,

---

1. Mr. and Mrs. Stang were married on November 10, 2006. This was the third marriage for each. Mr. Curtis was decedent's stepson.

she immediately noticed that decedent's condition had worsened — he was paler than when she left — and took him to the hospital.

Decedent arrived at the hospital at 6:08 P.M. and was examined by Dr. Frank Penater, an emergency room physician, at 6:15 P.M. Dr. Penater found decedent to be dehydrated and suspected he had the flu. As a precautionary measure, decedent was admitted to the hospital by Dr. Deborah Smith, an internist, for continued observation.

Dr. Smith was decedent's attending physician upon his admission to the hospital. During her initial assessment of decedent at 8:16 P.M., Dr. Smith detected signs of nystagmus and disconjugate gaze, and decedent reported experiencing double vision. Dr. Smith ordered a brain CT scan. The results of this exam revealed that decedent had suffered an acute ischemic stroke in the posterior inferior cerebellar artery, more commonly referred to as a PICA stroke. At this point, decedent was transferred to the hospital's ICU upon Dr. Smith's order. Also on this date, November 15, 2007, at 10:45 P.M., Dr. Smith requested a neurological consult from Dr. Rajinish Chaudhry, the on-staff neurologist for the hospital.

Between his admission on November 15, 2007, and his death on November 21, 2007, decedent was under the care of three separate attending physicians: Dr. Smith from November 15, 2007 to November 17, 2007; Dr. Joseph McGinley from November 17, 2007 to November 19, 2007; and Dr. Patrick Hanley, from November 19, 2007 to November 21, 2007. During this time, decedent's attending physicians neither ordered nor provided prophylactic preventive care against DVT and PE (e.g., anticoagulation therapy such as low dose Heparin) to decedent.

Decedent was examined by Dr. Chaudhry on November

19, 2007, at 7:30 P.M., four days after the neurological consult was requested by Dr. Smith and two days before decedent's death. Dr. Chaudhry ordered aspirin to prevent clot formation. He also recommended transfer to a tertiary care hospital to rule out vertebral artery dissection. As noted above, decedent died on November 21, 2007.

Decedent's wife ("plaintiff"), individually and in her capacity as administratrix of decedent's estate, commenced the instant suit by praecipe for writ of summons filed on November 2, 2009. Named as defendants were the hospital; Drs. Smith, McGinley, Hanley, Lesitsky and Chaudhry; and Neil Wesner, M.D.[2] In her pleadings and in pretrial proceedings, including medical expert reports, plaintiff claimed that all of the defendants were negligent in their care and treatment of the decedent, that the Hospital was liable on either a respondeat superior or corporate negligence theory, and that the negligence of each caused or contributed to decedent's death. Each of the defendants contested liability and obtained expert reports in support of their respective positions. No cross-claims were filed by any defendant against any other defendant.

Shortly before trial was scheduled to commence on December 3, 2012, plaintiff reached settlement with the hospital and decedent's attending physicians, Drs. Smith, McGinley and Hanley ("settling doctors"). (The hospital and settling doctors are collectively referred to herein as the "settling defendants."). As part of this settlement, plaintiff executed a pro rata joint tortfeasor release on November 27, 2012, (the "release") in accordance with the Uniform Contribution Among Tort-Feasors Act ("UCATA"), 42 Pa.C.S.A. §§ 8321-8327. This release provided that if Drs.

---

2. By order dated April 13, 2011, entered pursuant to stipulation, Dr. Wesner was dismissed as a defendant prior to trial.

Lesitsky and Chaudhry ("non-settling defendants") were found to be joint tortfeasors with the settling defendants, the damages the non-settling defendants would be required to pay would be reduced in proportion to the extent fault was attributed to the settling defendants.

After settlement was reached, plaintiff moved to discontinue the action against the settling defendants, to preclude evidence that plaintiff had sued the settling defendants, and to bar the non-settling defendants from cross-examining her medical experts at trial about opinions they had previously rendered against the settling defendants. These motions were denied.

Following a two-week trial which began on September 30, 2013,[3] the jury returned a verdict in favor of all defendants (excluding the hospital, for whom a compulsory nonsuit was granted),[4] finding none were negligent. Before us is plaintiff's motion for post-trial relief seeking a new trial.[5]

---

3. At plaintiff's request, a last minute continuance of the trial scheduled for December 3, 2012 was granted due to a family emergency of plaintiff's counsel. As part of counsel's agreement to continue trial, all counsel agreed to maintain the status quo as it existed for the trial which was to commence on December 3, 2012.

4. At the close of plaintiff's case, plaintiff moved for a compulsory nonsuit as to each of the settling defendants. We denied the motion as to the settling doctors and granted the motion as to the hospital. No party has appealed our decision to dismiss the hospital from this suit.

5. Plaintiff has preserved four determinative issues for post-trial relief. *See* motion for post-trial relief filed on October 21, 2013, letter dated December 6, 2013, withdrawing multiple issues from consideration, and plaintiff's brief in support of post-trial motion filed on January 13, 2014. Of these four issues, three are discussed below. The fourth concerns our order dated October 4, 2012, barring decedent's son, Andrew Stang, from testifying at trial as a discovery sanction. The reasons for that order were set forth in a footnote opinion to the order and will not be repeated here.

Since the October 4, 2012, order, two events have occurred rendering any error of which plaintiff complains, and we see none, harmless. First, ever since decedent's death, Andrew Stang has been withdrawn and emotionally unable to cope with his father's death. Andrew was

## DISCUSSION

1. Denial of Plaintiff's Motion to Discontinue Her Claims Against the Settling Defendants and to have the Settling Defendants Dismissed as Parties

Plaintiff claims we erred by denying her motion to discontinue her suit against the hospital and Drs. Smith, Hanley and McGinley, as well as placing the settling doctors' names on the jury verdict slip in order that the jury could determine the comparative liability of the settling doctors vis-a-vis the non-settling defendants. We disagree.

Section 8326 of the UCATA, the provision which controls set-off, provides:

A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid.

42 Pa.C.S.A. § 8326. Here, the release executed by plaintiff and given to the settling defendants stated in

eighteen years old when his father died. At trial, plaintiff's counsel placed in evidence a certification signed by Andrew (plaintiff's exhibit no. 80) which states, inter alia, that he "find[s] it extraordinarily difficult to talk about his father and the time surrounding his death" and that he does "not have the will or emotional fortitude to sit in the court and relive the nightmare of [his] father's death." Andrew Stang certification, paragraphs 8 and 10. This inability of Andrew Stang to appear in court or testify is wholly independent of our order.

Second, had Andrew Stang testified his testimony would have been relevant only to the issue of damages. As the jury found no liability against any defendant and never reached this issue, our October 4, 2012, order could have had no effect on the jury verdict.

pertinent part:

> It is understood that I, Lorrie Stang...am not hereby releasing any claims or demands that I have against Neil Lesitsky, M.D. and Rajinish Chaudhry, M.D. It is further understood and agreed, however, that if it should be determined that Neil Lesitsky, M.D. and Rajinish Chaudhry, M.D. are jointly or severally liable in tort to the plaintiffs with any person or entity herein released, the claim against and damages recoverable from Neil Lesitsky, M.D. and Rajinish Chaudhry, M.D. shall be reduced to the extent of the pro-rata share of legal responsibility or legal liability for which the parties herein released are found to be liable for as a consequence of the aforesaid medical care or treatment. It is intended that this Release shall comply with and be interpreted in accordance with the Uniform Contribution Among Joint Tortfeasor Act as enacted and amended in Pennsylvania.

The effect of this provision was to allow the non-settling defendants to reduce the amount of any monies jointly owed by them and the settling defendants to the plaintiff in an amount equal to the settling defendants' apportioned share of the verdict. *Baker v. ACandS*, 755 A.2d 664, 668 (Pa. 2000).

In this case, plaintiff alleged and supported with expert reports claims that the defendants failed to properly evaluate and treat decedent's stroke, and further failed to take proper steps to prevent or, at a minimum, reduce the risk of the deep vein thrombosis/pulmonary embolism that ultimately caused decedent's death. The claims as alleged in plaintiff's amended complaint and supported by her expert reports set forth claims of liability in tort against the defendants for the damages claimed by plaintiff, making

them, under plaintiff's pleadings and expert reports, joint tortfeasors as defined in the UCATA. *See* 42 Pa.C.S. § 8322.[6]

Under settled Pennsylvania law, the non-settling defendants were entitled to have the settling defendants remain as parties to this action in order to establish their status as joint tortfeasors and, if found to be joint tortfeasors, to have the jury apportion or allocate liability among them in order that the amount of damages the non-settling defendants might be liable to pay could be determined. Thus, the inclusion of the settling defendants as parties at trial was necessary for the jury to evaluate the respective fault of all tortfeasors alleged to have been negligent and responsible for decedent's death and, if applicable, apportion liability to the settling defendants. *See Baker*, 755 A.2d at 669 (noting that in negligence actions liability is allocated among joint tortfeasors according to percentages of comparative fault, citing 42 Pa.C.S.A. § 7102). Only by permitting the jury to consider the conduct of all defendants for whom a *prima facie* case was proven could comparative fault be fairly

---

6. The act defines the term "Joint Tort-feasors" as "two or more persons jointly or severally liable in tort for the same injury to persons or property...." 42 Pa.C.S.A. § 8322. Two actors are jointly liable for an injury if their conduct "causes a single harm which cannot be apportioned.... even though [the actors] may have acted independently." *Mattia v. Sears, Roebuck & Company*, 531 A.2d 789, 791 (Pa. Super. 1987) (quoting *Capone v. Donovan*, 480 A.2d 1249, 1251 (Pa. Super. 1984)), *appeal denied*, 546 A.2d 622 (Pa. 1988); *Neal v. Bavarian Motors, Inc.*, 882 A.2d 1022, 1027 (Pa. Super. 2005). That the settling and non-settling defendants are joint tortfeasors appears as well to be acknowledged by plaintiff in her amended complaint. *See* plaintiff's amended complaint, first unnumbered paragraph and paragraph 87; the *ad damnum* clauses of each numbered count, which demand judgment against the named defendant "jointly and severally with co-defendants"; and the *ad damnum* clauses of count IX (wrongful death) and count X (survival), which demand "judgment in [plaintiff's] favor against defendants, jointly and severally."

and intelligently apportioned. Inclusion of the settling defendants for these purposes is implicit in the UCATA and was contemplated by the language of the release quoted above.

In *Davis v. Miller*, 123 A.2d 422 (Pa. 1956), the Pennsylvania Supreme Court held that a defendant had the right to keep a settling additional defendant at trial for purposes of apportionment under the then current version of UCATA. In *Davis*, the plaintiff, Davis, sued Miller, the driver of the car which struck the vehicle in which Davis was riding; Miller in turn named as an additional defendant Richardson, the driver of the car in which Davis was a passenger. Davis subsequently entered into a joint tortfeasor release with Richardson, pursuant to which the trial court discharged her from the case. The Supreme Court reversed based upon comparable language of the UCATA, stating:

> It is therefore clear that an important factor in the determination of the amount of damages that Miller may be required to pay to plaintiffs is whether or not Mary Richardson would also have been liable to them had they not released her-in other words, whether she was a joint tortfeasor with Miller. If such she was, then, under the Act and the terms of the releases which plaintiffs gave her, they can recover from Miller only his pro rata share, in this case half, of the amount to which they otherwise would have been entitled; if, on the other hand, she was not a joint tortfeasor, the releases given her by plaintiffs would not inure to Miller's benefit....

> Therefore, *although Miller cannot recover contribution from the additional defendant, he does have an extremely valuable right in retaining her in the case, because, if the jury should find her to be a joint*

*tortfeasor, his liability to plaintiffs would be cut in half. Her continuance in the case is therefore necessary, even though no recovery can be had against her either by plaintiffs or by defendant, in order to determine the amount of damages that defendant may be obliged to pay plaintiffs in the light of the situation created by their releases of the additional defendant's liability.*

*Id.* at 424 (emphasis added)(citations omitted). *See also Slaughter v. Pennsylvania X-Ray Corp.*, 638 F.2d 639, 643-644 (3d Cir. 1981) ("Pennsylvania cases hold that even though he has settled with the plaintiff and obtained a pro rata release, a defendant must nevertheless participate in the trial so that the jury may determine the issue of joint or sole liability.") (citing *Davis v. Miller*, 123 A.2d 422 (Pa. 1956)).[7]

---

7. The Uniform Contribution Among Tort-feasors Act "is a comprehensive act which dictates the effect of a release as to other tortfeasors, the method for computing set-off, and under what circumstances an action in contribution is to be allowed." *Baker v. ACandS*, 755 A.2d 664, 667 (Pa. 2000).

Where a plaintiff and a settling defendant sign a pro tanto release, then the plaintiff's ultimate recovery against the non-settling joint tortfeasors is the total award of damages reduced by the amount of consideration paid for the release. In contrast, if the parties sign a *pro rata* release (which is also known as an "apportioned share setoff" release), then the plaintiff's ultimate recovery against the non-settling tortfeasors is the total award of damages reduced by the settling party's allocated share of the liability.

*Id.* at 666 n.1. Nevertheless, "a non-settling defendant is not entitled to a set-off in light of the settling defendant's release unless the settling and non-settling defendants are both deemed to be joint tortfeasors. 42 Pa.C.S.A. § 8326." *Id.* at 671.

Because joint tortfeasors are jointly and severally liable, meaning that one joint tortfeasor may be compelled to satisfy the entire money judgment, the UCATA is designed with the equitable goal that a joint tortfeasor pay only his fair share of the plaintiff's injuries for which he is responsible. To achieve this result, a "joint tortfeasor's recourse for paying more than its proportionate share of the verdict is to sue the non-paying joint tortfeasors in contribution. *See* 42 Pa.C.S.A. § 7102; 42 Pa.C.S.A. §§ 8324 (c) and 8327." *Baker*, 755 A.2d at 669.

As to the right of contribution provided for under Section 8324 (b) of the UCATA, the *Mattia* Court stated:

The right to retain the settling defendants as parties to the litigation is not dependent upon whether cross-claims have been filed by the non-settling defendants against them. On this issue, the court in *National Liberty Life Ins. Co. v. Kling Partnership*, 504 A.2d 1273 (Pa. Super. 1986) stated that "[c]ross-claims for contribution are [ ] unnecessary in order to retain the settling defendants as parties to the litigation for the sole purpose of determining the extent, if any, of [a non-settling defendant's] right, pursuant to the joint tortfeasor release, to a reduction in any verdict rendered against it after trial..." *Id.* at 1277-78. *See also Hyrcza v. West Penn Allegheny Health System, Inc.*, 978 A.2d 961 (Pa. Super. 2009) (discussing, in a case

---

The right of contribution may be asserted during the original proceeding via joinder of a third-party defendant. *See* Pa.R.Civ.P. 2252. Or it may be pursued in a separate action brought by a tortfeasor who has previously been held liable to the original plaintiff. In the latter instance, the party seeking contribution must stand in the shoes of that original plaintiff and prove that the new defendant was a joint tortfeasor and that his tortious conduct also caused the harm at issue. *Mattia*, 531 A.2d at 791-92 (citation omitted).

Requiring the settling defendants to remain as parties to the litigation and thus allowing the jury to potentially apportion liability to the settling defendants was necessitated further by the terms of the release which would otherwise prohibit the non-settling defendants from seeking contribution. *See* 42 Pa.C.S.A. § 8327 (liability to make contribution as affected by release) which provides:

A release by the injured person of one joint tortfeasor does not relieve him from liability to make contribution to another tortfeasor, *unless the release is given before the right of the other tortfeasor to secure a money judgment for contribution has accrued* and provides for a reduction to the extent of the pro-rata share of the released tortfeasor of the injured person's damages recoverable against all the other tortfeasors.

(emphasis added). *Compare National Liberty Ins. Co. v. Kling Partnership*, 504 A.2d 1273 (Pa. Super. 1986) where the court found that late joinder of an additional defendant was appropriate because the defendant's right to institute a separate action for contribution against the additional defendant was destroyed by a settlement between the plaintiff and the additional defendant. *See also Mattia*, 531 A.2d at 792 (noting that in a claim for contribution, the statute of limitations does not begin to run until the date of entry of judgment in favor of the original plaintiff).

where no defendant filed a cross-claim against any other defendant, the right of a non-settling defendant to have a settling defendant included on the verdict slip), *appeal denied*, 987 A.2d 161 (Pa. 2009); *Herbert v. Parkview Hospital*, 854 A.2d 1285 (Pa. Super. 2004) (affirming the trial court's inclusion of the settling defendants on the verdict slip, thus allowing the jury to apportion liability, where the plaintiff and settling defendants entered a joint tortfeasor release which provided, *inter alia*, that in the event the non-settling defendant was determined to be jointly or severally liable with a settling defendant any damages recoverable against the non-settling defendant would be reduced by the pro rata share of legal responsibility or legal liability for which the settling defendants were found to be liable; no cross-claim was made by the non-settling defendant against the settling defendants), *appeal denied*, 872 A.2d 173 (Pa. 2005). Cf. 42 Pa.C.S.A. § 7102 (b.2) (apportionment of responsibility among certain nonparties and effect). We proceed next to examine whether the evidence was sufficient to establish the elements of a *prima facie* case of medical malpractice against the Settling Doctors.

2. Existence of *Prima Facie* Case Against Settling Doctors

Although a non-settling defendant has a right to require a settling defendant to remain as a party in the case during trial, there is no absolute right to have the settling defendant on the verdict slip. *Hyrcza*, 978 A.2d at 968. For a settling defendant to be included on the verdict slip, the evidence, when read in the light most favorable to the non-settling defendant, must establish a *prima facie* case of negligence against the settling defendant. *Id.* at 969.[8] This standard

---

8. The four elements that a plaintiff must prove to support a claim

442

was met as to the settling doctors.

Plaintiff's expert, Dr. Mark Graham, board certified in internal medicine, testified unequivocally that the settling doctors were negligent in their care of decedent and, further, that this negligence increased the risk of harm, including death, to decedent. (N.T. 10/2/13, pp. 176-178, 180-183, 186-191). As to Dr. Smith, Dr. Graham testified that she deviated from the standard of care in failing to order aspirin and other anti-coagulation therapy for decedent (N.T. 10/2/13, pp. 180, 183) which increased the risk for decedent's stroke progression and DVT or PE (N.T. 10/2/13, pp. 182-183), and that Dr. Smith's negligence in failing to provide DVT prophylaxis deprived decedent of his "best chance" to prevent DVT. (N.T. 10/2/13, p. 186). As to Drs. McGinley and Hanley, Dr. Graham testified that they deviated from the standard of care by failing to order DVT prophylaxis, low-dose Heparin, and compression boots (N.T. 10/2/13, p. 188), thereby depriving decedent of his best chance to prevent DVT and/or PE and substantially increasing his risk of death. (N.T. 10/2/13, p. 189).

Dr. Graham further characterized the judgment of Drs. McGinley and Hanley that anticoagulation therapy was contraindicated due to decedent's hypertension as

---

of medical malpractice are:
    (1) that the medical practitioner owed a duty to the patient,
    (2) that the practitioner breached that duty.
    (3) that that breach was a proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient, and
    (4) that the damages suffered by the patient were a direct result of the harm.
*Herbert v. Parkview Hospital*, 854 A.2d 1285, 1290 (Pa. Super. 2004). Further, where a medical expert opines that a treating physician's failure to act deviated from the standard of care and thereby increased the risk of harm, which harm in fact occurred, the element of causation has been made out. *Hamil v. Bashline*, 392 A.2d 1280, 1283, 1286 (Pa. 1978).

"wrong" and "without merit." (N.T. 10/2/13, pp. 189-90). In Dr. Graham's view, there was "no question" that Drs. McGinley and Hanley "deviated" in their care of decedent. (N.T. 10/2/13, p. 191).

Dr. David Rosenbaum, a board-certified neurologist employed by plaintiff, testified that Dr. Chaudhry deviated from the standard of care for a neurologist by not seeing the decedent within twenty-four hours of the requested consult; that a neurologist should be aware that DVT prophylaxis is required by the standard of care for a stroke patient; that a neurologist who fails to prescribe aspirin and DVT prophylaxis for a stroke victim, if not prescribed by others, deviates from the standard of care; and that the failure to provide any DVT prophylaxis to decedent while he was in the hospital and the failure to provide aspirin or to transfer decedent to a stroke center at an earlier point in time, all caused or contributed to decedent's death. In addition, Dr. Rosenbaum testified that Drs. Smith, McGinley and Hanley were each aware of the increased risk of DVT and PE due to stroke and their failure to provide or order any anticoagulation therapy caused or contributed to decedent's death.

As the foregoing shows, during plaintiff's case-in-chief the evidence presented clearly allowed the jury to conclude that the settling doctors deviated from the applicable standard of care and that each of these deviations caused or contributed to decedent's death. Under *Herbert*, this was sufficient to include the settling doctors on the verdict slip. Moreover, to the extent plaintiff's experts' attribution of negligence to the non-settling defendants was predicated on facts and conduct equally applicable to the settling doctors, even absent any explicit attribution of fault to the settling doctors, the jury was entitled to take such information into account in assessing liability

on the settling doctors. Here, as in *Herbert*, the plaintiff's expert testimony offered as to the non-settling defendants' liability "cast an equally damning light on the performance of every physician who had a hand in treating decedent." *Herbert*, 854 A.2d at 1290.

3. Scope of Cross-examination of Plaintiff's Expert Witnesses

Prior to trial, plaintiff's medical experts opined that not only the non-settling defendants, but also the settling defendants, were negligent and responsible for decedent's death. In particular, in Dr. Graham's expert report he criticized the care provided by both the non-settling and settling defendants, opining that such care deviated from the applicable standard of care, and concluding that this deviation caused or contributed to decedent's death. Dr. Rosenbaum, who was critical of Dr. Chaudhry's neurological care of the decedent, also opined that the delay in getting decedent to the hospital which resulted from Dr. Lesitsky's failure to advise Mrs. Stang to take her husband to the hospital immediately for stroke evaluation both increased the risk of harm and caused or contributed to the decedent's death. Absent settlement of plaintiff's claims against the settling defendants, these experts were scheduled to testify on plaintiff's behalf against the settling defendants.

Once settlement was reached, plaintiff requested that the testimony of Drs. Graham and Rosenbaum be limited to their opinions critical of the non-settling defendants only and that the non-settling defendants be barred from cross-examining plaintiff's experts as to any opinions held by them critical of the settling defendants. By order dated September 16, 2013, we refused to restrict the scope of the non-settling defendants' cross-examination of plaintiff's

medical experts as requested by plaintiff.

In *Boucher v. Pennsylvania Hospital*, 831 A.2d 623 (Pa. Super. 2003), the court stated:

Generally, every circumstance relating to the direct testimony of an adverse witness or relating to anything within his or her knowledge is a proper subject for cross-examination, including any matter which might qualify or diminish the impact of direct examination. Specifically regarding medical experts, the scope of cross-examination involving a medical expert includes reports or records which have not been admitted into evidence but which tend to refute that expert's assertion.

*Id.* at 629 (citations and quotation marks omitted), *appeal denied*, 847 A.2d 1276 (Pa. 2004). *See also Kemp v. Qualls*, 473 A.2d 1369, 1371 (Pa. Super. 1984) (holding that "[e]very circumstance relating to the direct testimony of an adverse witness or relating to anything within his or her knowledge was a proper subject for cross-examination, including any matter which might qualify or diminish the impact of direct examination"); *Rose v. Hoover*, 331 A.2d 878, 882 (Pa. Super. 1974) (stating that "cross-examination may embrace any matter germane to the direct examination, qualifying or destroying it, or tending to develop facts which had been improperly suppressed or ignored by the plaintiff").

Without question, cross-examination of plaintiff's medical experts with respect to the entirety of their opinions as expressed in their expert reports was permissible for impeachment purposes: the manner in which plaintiff sought to limit the testimony of her medical experts in her case-in-chief would otherwise have been skewed and given the false impression that these experts were of the opinion that the non-settling

defendants alone were responsible for decedent's death. *Conley v. Mervis*, 188 A. 350 (Pa. 1936) (explaining that the limitations of cross-examination are not intended to provide a cloak for the concealment of material facts pertaining to issues touched upon in direct examination and that any limitation on the scope of cross-examination that would allow a party to ignore or otherwise suppress facts of an adverse and harmful character would defeat one of the vital reasons for cross-examination), overruled in part on other grounds by *DeWaele v. Metropolitan Life Ins. Co.*, 58 A.2d 34 (Pa. 1948); *see also* Pa.R.E. 611 (a) (1) (requiring that the trial court's control over the mode and order of examining witnesses and presenting evidence allow for effective determination of the truth). The non-settling defendants had every right to point the finger and elicit evidence through plaintiff's experts that the cause of decedent's death was not the failure by Dr. Lesitsky to immediately refer decedent to the emergency room for a physical evaluation or any delay in Dr. Chaudhry's neurological consult or treatment — the non-settling defendants' experts being of the opinion that decedent would have ultimately fully recovered from his stroke — but the failure to provide DVT prophylaxis once decedent was admitted to the hospital, for which the non-settling doctors argued they were not responsible.

Moreover, this evidence was also admissible to prove the substantive liability of the settling defendants. First, the evidence was not hearsay. The opinions being elicited were those of the witness on the stand being cross-examined and they were clearly subject to questioning by all parties. Nor did such questioning run afoul of the rule that one party may not compel an expert for the opposing party to offer an opinion against his will. *Boucher*, 831 A.2d at 632. "The basis for this rule is an acknowledgment of an expert's

proprietary interest in his own opinion, and the recognition that he should not be required to relinquish it without his consent." *Id.* In contrast, the opinions at issue here were independently subject to disclosure for impeachment such that any proprietary interest against disclosure claimed by plaintiff's medical experts is illusory. Nor was there any question that these experts were competent to express the opinions on which they were cross-examined: the experts were employed by plaintiff; the opinions were prepared at plaintiff's behest, with the intent of having them offered at trial against the settling defendants; the opinions were identical to those which plaintiff intended to present against the settling defendants had settlement not been reached; and, understandably, no objection to competency was raised by plaintiff.[9]

## CONCLUSION

The standard for granting a new trial for rulings made by the court requires not only technical error, but also demonstrated harm. *Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1122 (Pa. 2000). For the reasons already stated, we find no error. In addition, plaintiff has failed to identify any harm.

The jury concluded that none of the individual defendants were negligent in their care of decedent. Consequently, not only did the jury find that neither

---

9. In addition, at no time did plaintiff request a limiting instruction that the non-settling defendants' cross-examination of plaintiff's medical experts be restricted to impeachment purposes. *See* plaintiff's motion to preclude evidence of, references to and examination of plaintiff's expert witnesses and the settling defendants on DVT/PE prophylaxis, non-settling defendants' responses thereto, court order dated September 16, 2013, ruling on the motion, and plaintiff's objection at the time of trial. (N.T. 10/2/13, p. 3) (making no distinction in plaintiff's objection to the non-settling defendants' cross-examination of plaintiff's medical witnesses between cross-examination for substantive or impeachment purposes).

448

non-settling defendant was responsible for any harm to plaintiff's decedent, it simultaneously found that even if one or both non-settling defendants had been at fault, no amount would be set off against any recovery from the non-settling defendants for conduct attributable to the settling doctors. Given this verdict, we see no harm to plaintiff by our rulings which retained the settling defendants in the case and which ultimately allowed the names of the settling doctors to be placed on the verdict slip. *See also Kol v. Trinh*, 2005 WL 4717493 (C.P.Phila. Cty. 2005) (denying plaintiff's motion to discontinue and dismiss a settling doctor as a party defendant in a medical malpractice suit, placing the settling defendant's name on the verdict slip for purposes of apportioning damages, and permitting non-settling defendant's counsel to cross-examine plaintiff's expert witness with respect to the negligence of the settling defendant).[10]

---

10. This case is remarkably similar to the instant case on the key issues we address, including the jury's verdict finding none of the defendants, settling or non-settling, negligent. The trial court's opinion in *Kol* was affirmed by the Superior Court at 902 A.2d 988 (Pa. Super. 2006). Nevertheless, because this occurred in an unpublished memorandum opinion, we recognize it is of no precedential value. *Reed v. Pennsylvania National Mutual Ins. Co.*, 493 A.2d 710, 712 (Pa. Super. 1985) (holding that Superior Court's affirmance of a trial court opinion by unpublished memorandum opinion is of no precedential value).