J-A06020-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| GREGORIA HERRERA AND ALCIBIADES DELORBE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| GEORGIE BAUM, INCORRECTLY DESIGNATED AS GEORGE SUAREZ AND LUISA DIAZ | |
| APPEAL OF: GEORGE BAUM | |
| | No. 863 EDA 2014 |

Appeal from the Order Entered February 27, 2014
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): January Term, 2012 No. 01443

------------------------------------------------------------------------------

| | |
|---|---|
| GREGORIA HERRERA AND ALCIBIADES DELORBE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| GEORGE BAUM, INCORRECTLY DESIGNATED AS GEORGIE SUAREZ AND LUISA DIAZ | |
| APPEAL OF: LUISA DIAZ | |
| | No. 1007 EDA 2014 |

Appeal from the Order Entered February 27, 2014
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): January Term, 2012 No. 01443

BEFORE: PANELLA, J., OTT, J., and JENKINS, J.

MEMORANDUM BY OTT, J.:                                    **FILED JUNE 16, 2015**

In this consolidated appeal involving negligence claims arising from a motor vehicle accident, Defendants George Baum and Luisa Diaz appeal from the judgment dated February 27, 2014, but not entered until March 5, 2014.[1] The jury determined that Baum and Diaz were each 50% negligent and their negligence was the factual cause of injuries to Herrera. The jury awarded Herrera $225,000.00 and her husband, Alcibiades Delorbe, $10,000.00 for loss of consortium. Baum and Diaz have raised three common issues. Diaz raised two additional issues. In the common issues, Baum and Diaz claim the trial court erred: (1) in determining Herrera was entitled to full tort coverage from her automobile insurer; (2) in refusing to allow defense counsel to cross examine Herrera's medical expert with medical records from Herrera's treating physicians; (3) in failing to sustain multiple objections to misrepresentations made by Herrera's counsel during closing argument. Additionally, Diaz claims the trial court erred: (4) in charging the jury that Diaz was subject to the assured clear distance rule; and (5) in entering judgment when there were no economic damages presented and no medical records regarding Herrera's knee surgery.[2] After

---

[1] An appeal is properly taken from the entry of judgment, not from the order denying post-trial motions. Here, pursuant to the certified record, judgment was entered on the docket on March 5, 2014.

[2] We have restated these claims for clarity.

a thorough review of the certified record, submissions by the parties and relevant law, we reverse and remand for a new trial.

Preliminarily, the certified record reflects that Herrera and Delorbe were covered by Progressive Insurance policy 48135378-0 as of January 16, 2009. *See* Motion for Partial Summary Judgment, 12/3/2012. This policy covered four vehicles, including the Mercedes Benz occupied by Herrera and driven by Delorbe at the time of the accident. *Id*. This policy was a limited tort policy, as Herrera signed the required form, specifically choosing the limited tort option. *Id*. On February 23, 2009, approximately one month later, Delorbe obtained a replacement policy, 481969969-0, effective as of February 23, 2009. *Id*. This policy covered the same four vehicles with the same coverage limits. *Id*. This policy number appears to be currently in effect. *Id*. Delorbe signed the application form requesting both limited tort and full tort options. *Id*. The original tort application signed by Herrera, requesting limited tort, appears to have been attached to the second application as well. *Id*. The policy was issued as providing the less expensive limited tort coverage and Delorbe and Herrera have paid for the limited tort option since the policy's inception. *Id*. Baum filed a motion for partial summary judgment, seeking a declaration that Herrera was bound by the limited tort option. The motion was denied due to the ambiguity in Delorbe's application. *See* Order, 1/15/2013.

The evidence at trial showed that on the afternoon of January 28, 2010,[3] Herrera was a passenger in Delorbe's, 2002 Mercedes ML320 Wagon as they drove on Rising Sun Avenue in Philadelphia. N.T. Trial, 9/24/2013, at 96. While stopped at a traffic light, the Delorbe vehicle was struck from behind, either once or twice. *Id*. at 96-97. Diaz's vehicle was immediately behind the Delorbe vehicle. Baum's vehicle was behind Diaz's. There was an issue whether Diaz's vehicle struck Delorbe and then Baum struck Diaz, causing a second impact to Delorbe, or if Baum struck Diaz and forced her vehicle into Delorbe's vehicle, thereby causing a single impact. *Id*. at 67.[4]

A complaint was filed in this matter on January 12, 2012. The complaint alleged severe and permanent injuries but made no allegation of a knee injury. One week before trial, counsel for Herrera filed a motion *in limine* seeking to preclude reference and introduction into evidence of the medical records of Drs. George and Daisy Rodriguez (IRC) regarding the treatment supplied to Herrera. The motion claimed the treating records were hearsay and were highly prejudicial to Herrera. On the morning of trial, the trial court orally granted the motion in part, allowing reference only

_____

[3] We note that Herrera's counsel asserted the accident occurred between 4:00 and 5:00 p.m. and Diaz testified she thought it was about that time. N.T. Trial, 9/24/2013, at 62. However, Police Officer Joseph Sugan testified, pursuant to his report, he responded to the accident scene at 3:00 p.m. N.T. Trial, 9/26/2013, at 24.

[4] Because of the nature of the claims, we will relate the facts in two parts. The second part will begin after the discussion of tort election.

to the history section of the treating records of Drs. George and Daisy Rodriguez. The court's ruling precluded records from being entered into evidence and published to the jury. Counsel for Herrera stated the order exactly matched a stipulation between the parties. The defense did not object to that characterization.

We will initially address the three common issues.

**TORT ELECTION**[5]

The first issue is whether Herrera was correctly determined to have been considered "full tort."[6] Tort coverage is a function of a claimant's own automobile insurance coverage. "Full tort" allows a claimant to seek any

---

[5] Although both Diaz and Baum have raised this issue on appeal, the relevant motion for partial summary judgment on this issue was filed by Baum, solely. However, it is clear from our review of the certified record that the resolution of the tort election issue was intended to be a global resolution, binding all parties. Herrera has not argued, nor do we believe, that Diaz's failure to formally join in Baum's motion constitutes waiver on her part.

[6] As previously mentioned, the trial court denied Baum's motion for summary judgment on the issue of tort status and held Herrera was entitled to full tort status. Our standard of review regarding an order of summary judgment is well-settled:

> [A]n appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo.* This means we need not defer to the determinations made by the lower tribunals.

*Summers v. Certainteed Corp.*, 997 A.2d 1152, 1156 (Pa. 2010) (citation omitted).

and all damages that flow from the automobile accident. "Limited tort" allows a claimant to receive non-economic damages only if that claimant has suffered a "serious injury." A serious injury is defined as "death, serious impairment of body function or permanent serious disfigurement." *See* 75 Pa.C.S. § 1702. Tort coverage is determined, in the original instance, upon purchase of the automobile insurance policy. Once tort coverage has been elected, it remains in effect until affirmatively changed. *See* 75 Pa.C.S. § 1705(b)(1). At the time of purchase, a named insured must be given the opportunity to elect one of the coverage options. *See* 75 Pa.C.S. § 1705(a)(4). Any named insured may make the tort election. *See* 75 Pa.C.S. § 1705(a)(2). Pursuant to 75 Pa.C.S. § 1705(b)(1), once a tort option has been elected by a named insured, that election will carry forward through all subsequent renewals and replacement policies until a properly executed form electing the other option is received by the insurer. A "named insured" is "any individual identified by name as an insured in a policy of private passenger motor vehicle insurance." 75 Pa.C.S. § 1705(f).

In determining that Herrera was covered by the full tort option, the trial court found that because Delorbe had signed on both option lines, pursuant to 75 Pa.C.S. § 1705(a)(3), he was conclusively presumed to have

chosen full tort. Additionally, the trial court cited ***L.S. v. Eschbach***, 874 A.2d 1150 (Pa. 2005), although no explanation was provided.[7] We disagree. The citation to Section 1705(a)(3) is incorrect as a matter of law. Section 1705(a)(3) states:

> 3) If a named insured who receives a notice under paragraph (1) does not indicate a choice within 20 days, the insurer shall send a second notice. The second notice shall be in a form identical to the first notice, except that it shall be identified as a second and final notice. If a named insured has not responded to either notice ten days prior to the renewal date, the named insured and those he is empowered by this section to bind by his choice are conclusively presumed to have chosen the full tort alternative. All notices required by this section shall advise that if no tort election is made, the named insured and those he is empowered to bind by his choice are conclusively presumed to have chosen the full tort alternative. Any person subject to the limited tort option by virtue of this section shall be precluded from claiming liability of any person based upon being inadequately informed.

75 Pa.C.S. § 1705(a)(3).

To be properly understood, Paragraph (a)(3) must be read in context with Paragraph (a)(1). Paragraph (a)(1) states:

> Each insurer, not less than 45 days prior to the first renewal of a private passenger motor vehicle liability insurance policy on and after July 1, 1990, shall notify in writing each named insured of the availability of two alternatives of full tort insurance and limited tort insurance described in subsections (c) and (d). The notice shall be a standardized form adopted by the commissioner and shall include the following language:

75 Pa.C.S. § 1705(a)(1).

---

[7] Remarkably, there is no binding case law regarding this situation, in which both tort options were elected.

Paragraph (a)(1) applies to those automobile insurance policies in effect at the time the law changed, July 1, 1990. The named insureds of those polices were required to be sent the notices described therein. Reading Paragraph (a)(3) in conjunction with Paragraph (a)(1) describes what an insurer must do when a named insured was given notice under Paragraph (a)(1) but did not respond. The insurer must send another notice and if no response is received, the named insured, and anyone else who would have been bound by a tort election, are "conclusively presumed" to have chosen the full tort option. The policy at issue herein was not in effect on July 1, 1990. Therefore, Section 1705(a)(3) does not apply to the analysis of an ambiguous tort election form signed in 2009. Accordingly, the trial court's reliance on this section was an error of law.[8]

The trial court also relied upon **L.S. v. Eschbach**, **supra**. **L.S.** determined that the parents' election of limited tort did not apply to a minor who was a pedestrian when she was struck by an automobile. Because the trial court provided no further discussion of **L.S.**, we presume the trial court was adopting Herrera's claim the case stands for the proposition that "wherever an ambiguity exists with respect to the tort option, the trial Court must defer to Full Tort." **See** Herrera's Response to Motion for Partial

---

[8] 75 Pa.C.S. § 1705(a)(4) applies to those situations where a person is purchasing an initial policy from an insurer after the July 1, 1990 change of law. 75 Pa.C.S. § 1705(b)(1) applies to renewal and replacement policies, and will be discussed *infra*.

Summary Judgment, 1/3/2013, at ¶ 8. However, *L.S.* is not as strict as Herrera posits. *L.S.* actually states: "where there is a question about [which] coverage will apply, there is a conscious attempt to rule in favor of the full tort alternative." *L.S.*, 874 A.2d at 1157. While the law favors a determination of full tort status, it does not mandate that coverage; an important distinction.

In contrast to the trial court's determination that Delorbe's ambiguous election form mandated full tort coverage, Baum and Diaz assert any ambiguity in Delorbe's election form is not controlling in light of Herrera's prior election and the unchallenged fact that the policy has always identified limited tort coverage. After a thorough review of the certified record and relevant law, we agree with Baum and Diaz.

Initially we note that pursuant to statutory definition, both Delorbe and Herrera were named insureds under both policy numbers 48135278-0 (the Herrera policy) and 48196969-0 (the Delorbe policy). Section 1705(f), *supra*. That is to say, both Alcibiades Delorbe and Gregoria Herrera were specifically identified by name as an insured under the policy.[9] It is important to note that Section 1705 does not limit election of tort option to

---

[9] We note that Herrera would have been an "insured" under the policy even had she not been specifically named. Pursuant to Section 1705(f), an insured under a policy includes a resident spouse.

first named insureds.[10]  Rather, election of the tort option is vested to any named insured.  This determination is reflected by the fact that both the election form as provided by statute and the insurance policy provide a signature line for a "named insured."  **Compare** 75 Pa.C.S. § 1731(b), (b.1), (c.1), providing rejection of uninsured (UM) and/or underinsured motorist (UIM) coverage must be made by the "first named insured." Accordingly, Herrera was permitted to elect limited tort coverage, which she did.  For reasons unexplained in the certified record, 5 weeks after Herrera obtained policy 48135278-0, Delorbe obtained a different policy, providing the same insurance limits for the same four vehicles as the prior policy.[11] While Delorbe signed the tort election form for both limited and full tort options, the record indicates Herrera's initial, unambiguous, tort election form was included with Delorbe's application.  The policy was re-issued as providing limited tort coverage and has provided limited tort coverage ever since that time.

Recognizing that application of Section 1705(a)(3) to the instant situation is incorrect as a matter of law, we note that the applicable

_____

[10] Although "first named insured" is not defined by statute, we believe that in practice, the first named insured is generally the owner of the vehicle being insured.

[11] It is possible the second policy was issued because in the first policy application, Herrera also signed the rejection forms for UM and UIM coverage. Delorbe, the first named insured, was required to sign those forms.

statutory provision is Section 1705(b)(1), addressing the application of tort options for renewal or replacement policies.

> (1) The tort option elected by a named insured shall apply to all private passenger motor vehicle policies of the named insured issued by the same insurer and shall continue in force as to all subsequent renewal policies, replacement policies and any other private passenger motor vehicle policies under which the individual is a named insured until the insurer, or its authorized representative, receives a properly executed form electing the other tort option.

75 Pa.C.S. § 1705(b)(1).

Here, Herrera, a named insured, applied for and received a policy of insurance covering four automobiles and providing limited tort coverage. Delorbe's subsequent insurance application sought coverage for the same vehicles already insured. Essentially, pursuant to Section 1705(b)(1), the law requires a named insured to affirmatively and unambiguously inform the insurer or the insurer's representative of a change in tort status. Accordingly, Delorbe's tort election form that checked both full and limited tort options could not operate to change Herrera's initial election of limited tort coverage.[12]

_____

[12] We emphasize that this analysis is not meant to apply to the scenario where an ambiguous tort election form is supplied in the first instance.

In light of the above, we reverse the trial court's order declaring Herrera is entitled to full tort status and find that limited tort status is applicable.[13]

We now relate further factual details relevant to the resolution to the remaining issues.

No injuries were reported to the police at the scene of the accident, although Herrera did present to Nazareth Hospital emergency room approximately six days later. N.T. Trial, 9/26/2013, at 28; 9/24/2013, at 98. At that time, Herrera complained of back and chest pain. *Id*. She testified she also felt a little knee pain but did not report it. *Id*. In June, 2010, Herrera visited the Injury Rehabilitation Centers of Pennsylvania (IRC) complaining of chest pain, low back pain and pain radiating to her left leg. *Id*. at 116. She was treated by Drs. George and Daisy Rodriquez of the IRC until August, 2010, at which time the medical reports indicated that to a reasonable degree of medical certainty, Herrera's knee pain was "most probably referred low back pain." *See* N.T. Dr. Allen Trial Deposition, 6/6/2013, Exhibit D-1 (IRC report, 8/26/2010).[14] At some point in 2011,

_____

[13] Herrera has argued that, regardless of tort status, Herrera suffered a serious injury, thereby allowing her to seek non-economic damages. This would render any discussion of tort election moot. However, in light of our discussion of Herrera's injuries and causation, we anticipate the possibility of a jury question regarding the nature of Herrera's injury.

[14] The official record contains five treatment reports from the IRC. These reports were exhibits used in the trial deposition of Herrera's expert, Dr. *(Footnote Continued Next Page)*

after her treatment at the Injury Rehabilitation Centers ended, Herrera went to the Dominican Republic for treatment.[15] N.T. Trial, 9/24/2013, at 103. In September, 2011, approximately 18 months after the accident, Herrera obtained an MRI of her left knee in the Dominican Republic. N.T. Dr. Allen Trial Deposition, 6/6/2013, Exhibit D-2 (medical report, 3/6/2012). The radiologist's report by Dr. Rosa Alvarez Malagon of Cedimat, noted a "horizontal laceration that affects the body and posterior horn of medial meniscus associated with minimal stress on the bones, moderate joint effusion." Baum Motion to Preclude, 8/6/2013, Exhibit A (Cedimat MRI report, 9/16/2011).[16]

In 2012, Herrera presented to Dr. Paolini for physical therapy. N.T. Trial, 9/24/2013, at 104. He referred her to South Philadelphia Open MRI for studies of her lumbar spine and left knee. The MRI report for the left knee notes Herrera had complained of left knee pain and swelling since the

_(Footnote Continued)_ _____

Mark Allen, and were also the subject of a motion to preclude, which will be discussed **_infra_**. For clarity, the first three reports, dated 7/6/2010, 7/29/2010 and 8/26/2010, detail Herrera's follow-up treatments. The two reports, dated 1/26/2012 and 3/26/2012, are discharge summaries. The 3/26/2012 report discusses Herrera's medical examination obtained in the Dominican Republic.

[15] Herrera is a naturalized citizen, originally from the Dominican Republic.

[16] The report is actually dated in the usual manner in the Dominican Republic, with the day first: 16/9/2011. We have transposed the month and date to manner of this country.

January 28, 2010 motor vehicle accident. The MRI showed a complex tear of the posterior horn of the medial meniscus associated with a small Baker's cyst. *See* N.T. Dr. Allen Trial Deposition, 6/6/2013, Exhibit A-5 (Report from Open MRI, 9/13/2012).

On December 6, 2012, almost three years post-accident, Herrera presented to Dr. Mark Allen, Herrera's medical expert, who examined Herrera a single time and provided medical impressions of cervical strain and sprain, lumbosacral strain and sprain with radiculopathy and protruding disc at L4-5 and L5-S1, and a torn medial meniscus of the left knee. N.T. Dr. Allen Trial Deposition, 6/6/2013, at 72, Exhibit A-2. His report did not address causation. Exhibit A-2. Dr. Allen provided Herrera with a shot of Depomedrol and Xylocaine to her left knee.[17] N.T. Dr. Allen Trial Deposition, 6/6/2013, at 52. At trial, Herrera's counsel presented Dr. Allen, via video recording, as an expert and as a treating physician, allowing him to testify beyond the scope of his report.[18] *Id*. at 33. In his testimony, Dr. Allen opined the knee injury was caused by the motor vehicle accident because a

_____

[17] This is a combination of anti-inflammatory and painkiller. N.T. Dr. Allen Trial Deposition, 6/6/2013, at 53.

[18] Dr. Allen was presented as an expert in orthopedics. He is board certified by the Academy of Orthopedic and Neurological Associates, apparently without specific designation. His trial deposition revealed that he is not certified in orthopedic surgery, having failed the examination on three occasions, or as an orthopedic specialist. N.T. Dr. Allen Trial Deposition, 6/6/2013, at 12-14.

complex tear, as noted in the 2012 MRI report, was indicative of a traumatic episode and Herrera complained of knee pain from the date of the accident. *Id*. at 36, 55. As she had not reported any other traumatic event, he believed the complex tear was a result of a progression of an initial knee injury caused by the motor vehicle accident of January, 2010. *Id*. at 58-59.

**EXPERT CROSS-EXAMINATION**

The next issue is whether the trial court erred in preventing Baum and Diaz from cross-examining Herrera's medical expert, Dr. Mark Allen, with the medical records from Drs. George and Daisy Rodriguez, of the IRC.[19]

On September 17, 2013, Herrera filed a motion *in limine* seeking to preclude Baum and Diaz from making reference to the treatment records of both Drs. Rodriguez. Further, Herrera sought to preclude any such medical records from being entered into evidence and from being published to the

---

[19] Our standard of review regarding the admission of evidence is as follows:

> "The admission or exclusion of evidence is within the sound discretion of the trial court, and in reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law." **B.K. v. J.K.**, 823 A.2d 987, 991-92 (Pa. Super. 2003). "Thus our standard of review is very narrow.... To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." **Hawkey v. Peirsel**, 869 A.2d 983, 989 (Pa. Super. 2005) (*citing* **Turney Media Fuel, Inc. v. Toll Bros.**, 725 A.2d 836, 839 (Pa. Super. 1999)).

**McManamom v. Washko**, 906 A.2d 1259, 1268-69 (Pa. Super. 2006).

jury. Dr. Allen, Herrera's medical expert, testified he did not rely upon the IRC medical records in forming his opinion. Herrera claimed the treatment records constituted impermissible hearsay and were highly prejudicial. ***See*** Motion *in Limine*, 9/17/2013, at 7.

Ruling on the motion was deferred until the morning of trial, at which time the trial court ruled:

> This 24th day of September, it is ordered and decreed that the plaintiffs' motion *in limine* is granted in part. It's further ordered that the defendant shall be permitted to reference the history section of the treatment records of Dr. George and Daisy Rodriguez at trial, including for purposes of impeachment, but shall be precluded from entering said records into evidence and from publishing said records to the jury.

N.T. Trial, 9/24/2013, at 4-5.

Immediately after the trial court announced its ruling, this exchange took place at sidebar:

> [Plaintiff's Counsel (P.C.)]: We did work out a stipulation prior to the ruling.
>
> THE COURT: That's the ruling. What do you want to do?
>
> [P.C.]: That's actually exactly the stipulation we had.
>
> THE COURT: Well, it's an order anyway.
>
> [Baum's Counsel]: Well, Your Honor, we respect this Court's order, of course, and in anticipation of the order, counsel and I have worked out some of the objections on the video transcript to make things go smoother.
>
> THE COURT: To the extent that any of the stipulations agreed to by and between counsel are anywhere different than the order, I'll allow it.

- 16 -

[Baum's Counsel]: Thank you.

*Id*. at 5-6.

The trial court found that by failing to object to the stipulation, Baum and Diaz waived any objection to the order. We are compelled to agree. The trial court was informed that independent of its ruling, the parties had agreed to the precise terms of the ruling. The cross-examination of Dr. Allen was then edited, thereby indicating the stipulation mirrored the ruling. Accordingly, Baum and Diaz have waived any objection to the ruling.[20]

_____

[20] Despite finding the issue waived, because we are remanding this matter for a new trial at which time this issue of preclusion may be raised again, we note that in support of this motion, Herrera cited *Sheely v. Beard*, 696 A.2d 214, 218 (Pa. Super. 1997) for the proposition, "[i]n Pennsylvania, medical records of other physicians, which were not relied upon by any doctor cannot be permitted into evidence because the records are impermissible hearsay." Motion *in Limine*, 9/17/2013, at ¶ 5. *Sheely* notes that medical reports on non-testifying doctors cannot simply repeat another's opinion without bringing to bear on it his or her own expertise and judgment. However, *Sheely* also notes, "It is well-settled in Pennsylvania that a medical expert is permitted to express an opinion which is based, in part, on medical records which are not in evidence, but which are customarily relied on by experts in her profession. This exception to the rule against hearsay was adopted in Pennsylvania law in 1971 in *Commonwealth v. Thomas*." *Sheely*, 696 A.2d at 218 (citations omitted). Accordingly, *Sheely* does not prohibit the medical reports of non-testifying doctors as hearsay, and does not address the cross-examination of an expert with the medical reports of a treating physician.

In contrast to the trial court's ruling and Herrera's argument, in *Boucher v. Pennsylvania Hospital*, 831 A.2d 623 (Pa. Super. 2003), a panel of our Court stated, "Specifically regarding medical experts, the "scope of cross-examination involving a medical expert includes reports or records which have not been admitted into evidence but which tend to refute that expert's assertion." *Id*. at 629. *See also Collins v. Cooper*, 746 A.2d 615 (Pa. Super. 2000) (same); and *Kemp v. Qualls, MD*, 473 A.2d 1369 (Pa. Super.
*(Footnote Continued Next Page)*

**CLOSING ARGUMENT**[21]

Next, Baum and Diaz claim the trial court erred in failing to sustain multiple objections raised during closing argument.[22] Specifically, Herrera's counsel (1) made reference to deposition testimony of Diaz that was not entered into evidence, (2) referred to Herrera's answers to interrogatories that were not entered into evidence, (3) claimed a reference in the complaint to "chondritis" proved Herrera had claimed knee pain throughout her lawsuit and (4) referred to Herrera's tax returns that were not entered into evidence.[23]

*(Footnote Continued)* ————————

1984) (right of cross-examination includes the right to examine the witness on any facts tending to refute inferences or deductions arising from matters testified to on direct examination).

[21] Herrera argues this issue has been waived by the failure to request a mistrial. *See McMillan v. 84 Lumber, Inc.*, 649 A.2d 932, 934 (Pa. 1994). The issue has been properly preserved for our review through timely objections. *See Factor v. Bicycle Technology, Inc.*, 707 A.2d 504, 507 (Pa. 1998).

[22] Regarding claims of misconduct in closing argument, we are mindful of the following standard:

> A new trial is to be granted where: the unavoidable effect of the conduct or language was to prejudice the factfinder to the extent that the factfinder was rendered incapable of fairly weighing the evidence and entering an objective verdict. **If [counsel's] misconduct contributed to the verdict, it will be deemed prejudicial and a new trial will be required.**

*Poust v. Hylton*, 940 A.2d 380, 385 (Pa. Super. 2007) (citation omitted) (emphasis in original).

[23] We have reordered the claims.

**Depositions**

In the closing argument, Herrera's counsel made specific reference to Diaz's deposition testimony, regarding how quickly Diaz had to apply the brakes before the accident and whether she had been following Herrera's vehicle too closely. These questions were at issue because although Diaz claimed she was stopped at the time of the accident and was pushed into Herrera's vehicle as a result of Baum striking her car, Herrera claimed to have felt two impacts, meaning Diaz independently hit Delorbe's vehicle. The trial court found no error in counsel's reference to Diaz's deposition testimony because the jury did not hear any new facts and those portions of the deposition had been used in Diaz's cross-examination.

Our review of the certified record confirms the trial court's determination. Diaz was cross-examined at trial using her deposition testimony on both issues. *See* N.T. Trial, 9/24/2013 at 63-64, 86. Accordingly, the references in closing argument were not improper.

**Interrogatories**

Next, Herrera's counsel referred to various answers to interrogatories to demonstrate Herrera's knee complaints had always been known and were a part of the lawsuit. A central aspect of the defense was Baum's and Diaz's assertion that Herrera made no complaints about her knee until well after the accident, thereby demonstrating any problems with her knee were not caused by the accident. Significantly, the Complaint did not contain references to a knee injury, and any suggestion to the contrary is belied by

the fact that Herrera's counsel had to amend the Complaint during trial to include that claim.[24]  While addressing the jury during closing, Herrera's counsel asserted the following:

> [Herrera's Counsel]: Well, two months after the filing of the Complaint they sent us interrogatories, questions.  We filled them out.  We sent them back.  One of the questions is, What problems is the plaintiff having?
>
> [Baum's Counsel]: Objection.
>
> [Herrera's Counsel]: Experiencing pain in her lower back, left knee -
>
> THE COURT: I'll note your objection.
>
> [Herrera's Counsel]: We filed the Complaint.  We knew that she had pain in the knee.   We knew that she had problems in the knee. We knew she had chondritis in the knee.  We knew that she should only get this MRI in the United States because we weren't confident with the Dominican Republic one, and that's exactly what happened.

N.T. Trial, 9/26/2013, at 103-104.

_____

[24] In relevant part, the Complaint claimed:

> Plaintiff, Gregoria Herrera suffered severe and permanent injuries to her chest, hip and back, including broad protrusion across the L5-S1 disc with facet hypertrophy, more on the right, disc bulge at L4-5 and L3-4 and costochondritis.  The plaintiff suffered internal injuries of an unknown nature.   Plaintiff suffered severe aches, pains, mental anxiety and anguish and a severe shock to her entire nervous system, and other injuries, the full extent of which is not yet known.

Plaintiff's Complaint, 1/12/2012, at ¶ 17.

There is no medical evidence regarding a separate knee injury until two years after the accident, in a follow up report from Drs. George and Daisy Rodriquez of the IRC.[25] The trial court agreed that reference to the interrogatories, which were not in evidence, was improper, but the reference was harmless as there was ample evidence that Herrera had suffered a knee

_____

[25] The report is a discharge summary dated 1/26/2012. Under the "Systems Review" heading is the notation, "She has been experiencing severe, left knee pain." The report does not attribute this pain to any incident or time period. This is the first time in a medical report knee pain is described separately from radiating pain.

Herrera's counsel referred to this report in his examination of Dr. Allen, incorrectly claiming the report was dated 1/26/2010 and therefore was evidence Herrera referenced "left leg pain as far back as when she first saw Dr. Rodriguez[.]" **See** N.T. Dr. Allen Trial Deposition, 6/6/2013, at 86. We note 1/26/2010 is two days *prior* to the accident at issue herein.

The second IRC discharge note, dated 3/6/2012, is the first written medical record in the certified record that refers to causation of the knee pain. The note refers to the MRI performed in the Dominican Republic reporting "a horizontal tear of the body and posterior horn of the medial meniscus[.]" The note further states, "this finding is not likely related to the motor vehicle accident of 1/28/2010. I state the above within a reasonable degree of medical certainty." **See** Dr. Allen Trial Deposition, 6/6/2013, Exhibit D-2.

An IRC medical report dated 8/26/2010, contains the first written notation of knee pain. However, that report also states, "It is my impression that this patient's knee pain is most probably referred low back pain. I state the above within a reasonable degree of medical certainty." Although this report is part of the certified record, it is not specifically labeled as an exhibit.

Although these records from IRC were precluded from *jury* consideration by stipulation, they are part of the certified record and are subject to review. We believe they are relevant to help us determine prejudice.

injury. We are compelled to disagree with the trial court's conclusion, as the issue was not whether Herrera had suffered a knee injury, but whether that injury was **caused** by the accident. Accordingly, the reference to the answers to interrogatories was improper and not harmless error.

**Chondritis/Costochondritis**

The next issue regarding the closing argument addresses a misstatement regarding Herrera suffering from chondritis. Initially, we note that the trial court found the issue waived for failure to make a timely objection. While we agree that no objection was raised immediately after this misstatement, Herrera's counsel followed the comment with the previously noted, improper reference to interrogatories. This reference included another misrepresentation regarding chondritis. We believe this claim of error is inextricably linked to the objection addressed to the improper reference to interrogatories. Accordingly, we will not parse the nature of that objection and we will address this claim.

As noted, the timing of Herrera's knee complaints was a central aspect of this trial. In arguing to the jury that Herrera had claimed her knee injury in the Complaint, Herrera's counsel stated:

> He talked about the Complaint, right? You heard him talk about the Complaint. You didn't see the Complaint, right? No. What's in the Complaint? Other injuries that may develop over time that may not have been discovered yet. And that's because at the time of the Complaint the MRIs had not been reviewed yet on the knee. And that's important. We didn't know there was a tear so we can't say there's a tear in there yet.

> What we did say was – and he said the word – chondritis. That's inflammation and swelling in the knee. That much we knew. We did not yet know that there was a tear. We knew there was swelling in the knee and that was in the Complaint.
>
> What else was there? Well, two months after the filing of the Complaint, they sent us interrogatories, questions.

N.T. Trial, 9/26/2013, at 102-103.

This portion of the closing argument represents a misstatement of both the Complaint and medical fact. First, quoted previously, the Complaint made no reference to chondritis; the Complaint stated costochondritis. Accordingly, Herrera's counsel incorrectly informed the jury what was in the Complaint. Second, as the trial court noted in its Pa.R.A.P. 1925(a) opinion, chondritis is defined by the Mayo Clinic as an inflammation of cartilage. However, Herrera's counsel compounded his original misstatement by incorrectly informing the jury that chondritis specifically referred to inflammation of **knee** cartilage. The Mayo Clinic defines costochondritis, the condition listed in the Complaint, as "inflammations of the cartilage that connects a rib to the breastbone (sternum)." **See** www.mayoclinic.org. This condition relates to the chest injury also claimed in the Complaint. Costochondritis has no application to any form of knee injury. Third, there was no medical testimony that Herrera ever suffered from chondritis of the left knee, or that a diagnosis of a torn medial meniscus equates to chondritis, or that chondritis necessarily precedes a diagnosis of a torn medial meniscus. Herrera's counsel misquoted his own Complaint and then provided an incorrect definition to the misquoted portion

in an argument designed to convince the jury the knee injury had been known and complained of throughout the legal process.[26]  We find this constitutes prejudicial error.

**Tax Returns**

The defense stated Herrera had not produced any documentation, such as tax returns, to support her claim of lost income.[27]  In response, Herrera's counsel claimed her tax returns showed she made more money in 2010 than she made in 2009, but the fact she made more money after the accident did not mean she would not have made even more absent the accident.  Counsel's reference to Herrera's tax returns were fleeting and

_____

[26] We note Herrera's counsel's explanation, found in the response to Post-Trial Motions, regarding the costochondritis/chondritis issue: "Plaintiff's counsel is not a medical doctor.  If he made a scientific error in classifying the type of injury sustained by Plaintiff then such an error was an honest one and not a material misrepresentation."  Plaintiff's Response to Post-Trial Motion, 12/20/2013, at 15, n.6.  Not having a medical degree is no excuse for such a misrepresentation. Counsel is responsible for understanding the nature of the claims they present or defend and for learning and using the relevant medical terms associated to those claims.

> A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

Rule of Professional Conduct 1.1

[27] Herrera testified she lost $200.00 per week from her inability to work at her beauty shop. That equates to $10,000 per year, assuming a 51-week work year, which is what counsel claimed in closing.  N.T. Trial 9/26/2013, at 66.

non-specific, more akin to an acknowledgement that tax returns had been filed, than an assertion that the returns would have demonstrated a loss of income. Accordingly, we find no error in the failure to sustain the objection to the reference to tax returns.

In sum, the references to the answers to interrogatories that had not been introduced into evidence addressed a central aspect of the trial, namely the timing of Herrera's complaint of knee pain as it relates to causation. Further, the improper reference to interrogatories included an improper reference to chondritis.  As noted above, this reference was improper for multiple reasons and also affected the same central aspect of the trial. Accordingly, we find the trial court's determination that there was nothing improper about Herrera's counsel's closing argument and any error would have been harmless to be an abuse of discretion.  Because these errors are critical to the timing of Herrera's knee injury and hence causation, we believe Baum and Diaz suffered prejudice.

The next two issues were raised solely by Diaz.

**ASSURED CLEAR DISTANCE RULE**

In the first issue, Diaz claims the trial court erred in charging the jury on the assured clear distance rule when the uncontradicted evidence demonstrated Diaz was stopped prior to striking the Delorbe vehicle.  The assured clear distance rule is based upon 75 Pa.C.S. § 3361 and essentially requires a driver to be able to stop safely within the distance the driver can clearly see.  The rule is applicable to situations where a driver is alleged to

have been following too closely, commonly referred to as tailgating. **See Phillips v. Lock**, 86 A.3d 906 (Pa. Super. 2014). Diaz is correct that the rule is inapplicable if she had already stopped her vehicle prior to collision. However, contrary to Diaz's assertion, the evidence was not uncontradicted that she had stopped prior to impact and was forced into Herrera's vehicle by Baum. Herrera testified she felt two impacts, not one. Although Herrera did not see the collisions as she was looking forward at the time of the impacts, her testimony that there were two impacts raises the question whether Diaz struck the Herrera vehicle and then Baum struck Diaz, causing the second impact. Diaz testified that she had been following behind the Herrera vehicle at a distance of approximately one-half car length. Accordingly, under the two-impact scenario, the trial court did not err in charging the jury regarding assured clear distance. Diaz is not entitled to relief on this issue.

**ECONOMIC DAMAGES**

In the final issue, Diaz claims the verdict was excessive in that there were no economic damages presented and Dominican Republic treatment for the knee injury was never reviewed by Herrera's medical expert, Dr. Allen. This claim was preserved through Diaz's post-trial motion for new trial and judgment notwithstanding verdict.[28]

---

[28] Our standard of review is as follows:

*(Footnote Continued Next Page)*

We disagree that no economic damages were presented by Herrera. She claimed she lost $200.00 per week due to her inability to work at her beauty shop. These damages were not confirmed by an expert, but Herrera was competent to testify as to how much money she made. Accordingly, this aspect of damages is supported by testimony.

However, we find merit in Diaz's challenge to economic damages related to the knee surgery. We note that Dr. Allen claimed he did not rely on the initial MRI report from the Dominican Republic. Herrera was in the Dominican Republic having her knee surgery at the same time Dr. Allen was giving his trial deposition. Therefore, he cannot have reviewed any documentation regarding that surgery. The certified record merely indicates that Herrera had surgery to her left knee. There was no medical testimony regarding the nature of the surgery. There was no medical testimony

*(Footnote Continued)* ────────────────

> A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict.... Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact.... A JNOV should be entered only in a clear case.

***Van Zandt v. Holy redeemer Hosp.***, 806 A.2d 879, 885-86 (Pa. Super. 2002) (citation omitted).

providing a causal link of the surgery to the accident. Indeed, such testimony would be impossible as the certified record indicates the Dominican Republic doctors did not relate the knee injury to the accident and Dr. Allen could not testify about surgery that had yet to occur.

We note that,

> where "the disability complained of is the natural and probably result of the injuries, the fact-finding body may be permitted to so find, even in the entire absence of expert opinion." The two must be "so closely connected and so readily apparent that a layman could diagnose (except by guessing) the causal connection."

*Montgomery v. Bazaz-Shegal*, 798 A.2d 742, 751 (Pa. 2002) (citations omitted).

We have noted throughout this decision the central dispute over whether the knee injury and surgery were related to the accident. It bears repeating there are three elements that must be proven to prevail in a personal injury negligence action: (1) negligence (duty and breach of duty), (2) causation, and (3) damages. *See Wittrein v. Burkholder*, 965 A.2d 1229, 1232 (Pa. Super. 2009). While the trial court is correct that there was medical evidence Herrera suffered a torn medial meniscus in the left knee, and that she had surgery on her knee, *see* Trial Court Opinion, 8/1/14, at 12, there remains a critical omission medically linking the surgery to the accident. Without that expert link, there is no proof of causation regarding the knee surgery and the amount of damages associated thereto cannot be supported. Accordingly, because the jury could only guess as to the

causality of the surgery, the judgment was unsupportable as rendered. Therefore, Diaz is entitled to relief on this issue.

In conclusion, because of significant errors during closing argument and a lack of evidence demonstrating causation between the accident, Herrera's knee surgery and the damages associated thereto, Baum and Diaz are entitled to relief. Accordingly, a new trial is granted. Additionally, we reverse the pre-trial order that held Herrera was entitled to full tort coverage.

Judgment vacated. Order reversed. This matter is remanded for a new trial consistent with this decision. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>6/16/2015</u>